UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| WAYNE L. JOHNSON, | * | CIV. 09-4038 |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | REPORT and RECOMMENDATION |
| | * | |
| MICHAEL J. ASTRUE, Commissioner, | * | |
| Social Security Administration, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff seeks judicial review of the Commissioner's final decision denying him a period of disability commencing on December 31, 2002, and payment of disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act.[1]  The Plaintiff has filed a Complaint and has requested the Court reverse the Commissioner's final decision denying the Plaintiff disability benefits and remand the matter to the Social Security Administration for further proceedings.  The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation.  For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be AFFIRMED.

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.   The definition of disability is the same under both Titles.  The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon his "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, the Plaintiff filed his application for both types of benefits on May 16, 2006. AR 81-87.  His coverage status for SSD benefits expired on September 30, 2007.  AR 7, 99.  In other words, in order to be entitled to  Title II benefits, Plaintiff must prove he was disabled on or before that date.  AR 7.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and a Standing Order dated November 29, 2006.

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed his application for benefits on May 16, 2006. AR 81-87. In a computerized, undated form entitled "Disability Report-Adult" Plaintiff listed the illnesses, injuries and conditions that limit his abilities to work as "Back problems." AR 107. When asked to describe how his illnesses, injuries or conditions limit his ability to work, Plaintiff stated, "can't stand for very long without pain, have trouble sitting, walking, standing." AR 107. Plaintiff further explained that he became unable to work on December 17, 1999 then changed jobs and decreased his hours, but completely stopped working on February 1, 2004. AR 107. In a form entitled "Function Report–Adult" he filed in connection with his application (AR 128-136) Plaintiff listed the following effects of his illnesses, injuries or conditions: "lifting-30 pounds, squatting hurts, bending not very far, standing 10 min. legs start to burn, reach slowly, walking 2-3 blocks, sit 2 hrs or so, kneeling hurts, stairs slow, stop tasks because of pain, pain stops concentration, don't get along with people like I used to."

Plaintiff's claim was denied initially on July 26, 2006, (AR 54), and on reconsideration on October 26, 2006. AR 62. He requested a hearing (AR 64) and one was held on February 14, 2008, in Sioux Falls, South Dakota, before Administrative Law Judge (ALJ) the Honorable Robert Maxwell. AR 18-51. On April 5, 2008, the ALJ issued a nine page, single-spaced decision affirming the previous denials. AR 7-15.

On April 24, 2008, Plaintiff's attorney sent a letter to the Appeals Council requesting review of the ALJ's decision. AR 16. The Appeals Council denied review of Plaintiff's claim on February 13, 2009. AR 1-3. Plaintiff then timely filed his Complaint in the District Court on April 2, 2009.

## FACTUAL BACKGROUND

**A.      Biographical Information**

Plaintiff was born in 1961.  He was forty-one on his alleged date of onset and forty-seven on the date of the administrative hearing.  AR 23.  He dropped out of high school in the ninth grade, but received his GED in 2001.  AR 29, 114.   He completed truck driving school in 1982.  AR 114. He is single, and lives alone in a mobile  home with his dog. AR 5-6.


**B.      Work Experience**

Plaintiff's  relevant work experience is as a cab driver, delivery truck driver, concrete truck driver, and tractor-trailer truck driver.  AR 30-31, 174.    His final job was as a taxi-cab driver.  AR 108, 174.  He quit that job because he did not think he could sit in the cab any longer.  AR 36. Plaintiff testified Dr. McKenzie told him he could not work anymore.  *Id.*  He had back surgery and received a worker's compensation settlement.  AR 36-37.  He did not return to work and has been living off his insurance settlement since 2004.  AR 25.


**C.      Medical Evidence**

**1.      Sioux Valley Hospital, n/k/a/ Sanford Medical Center (6/92-1/08)**

The record contains medical notes from a hospital admission in 1992 (AR 185-86 and 187-93) concerning an acute depressive episode.  Neither party contends Plaintiff continues to suffer from significant depression, nor does Plaintiff allege any sort of mental disorder contributes to his claim for disability benefits.  It is unnecessary, therefore, for the purposes of this decision to discuss the content of those records.


On December 23, 1999, Plaintiff underwent an MRI of the lumbosacral spine.  AR 194.  It revealed interspace narrowing and dehydration of the L4-5 and L5-S1 disc spaces without subluxation.  There was no central or lateral foraminal stenosis at the L3-4, but there was mild bilateral facet arthropathy with no root impingement.  At the L4-5 there was circumferential disc bulge with central disc protrusion effacing the ventral thecal sac.  There was no definitive impingement of the transverse interspinal lumbar and sacral roots.  The physician's impression was "Mild degenerative central spinal stenosis at the L4-5 with central disc protrusion but no definitive

nerve impingement and no lateral foraminal stenosis and no subluxation. A possible annular tear at the L5-S1 with no definitive protrusion or nerve root impingement. There is no central or lateral foraminal stenosis. Degenerative spondylosis at L4-5 and L5-S1." AR 194.

Plaintiff presented to Dr. Gary Halma at Sioux Valley Hospital on referral from Dr. McKenzie for a series of epidural blocks to treat his ongoing low back pain. AR 236. The first epidural block was administered on November 30, 2001. *Id.* The epidural injection was repeated a few weeks later. AR 238. Plaintiff received another epidural in February, 2002 and in July, 2002. AR 241, 246. He returned in August, 2002 for another epidural. AR 251.

Plaintiff presented at the Sioux Valley Emergency Room on January 2, 2003. AR 255. He complained of low back pain. He requested and received an epidural injection. *Id.* He returned as an outpatient on April 7, 2003 for another epidural. AR 257. At that time Plaintiff was still driving a cab and he reported his low back pain was worse after long periods of sitting. *Id.* He received another epidural on July 15, 2003, after having once again presented to the Sioux Valley Emergency Room requesting the procedure. AR 267. He received another epidural on October 2, 2003. AR 274.

Plaintiff was admitted to Sioux Valley Hospital on June 1, 2004 for an interbody fusion at the L4-5 and L5-S1 levels of his spine. AR 328. Dr. Bryan Wellman performed the surgery. *Id.* The procedure is described in the discharge note as an "anterior lumbar interbody fusion with LT cages, bone morphogenic protein; L4-5 and L5-S1 anterior instrumentation." AR 324. The surgery was accomplished without complication. *Id.* Plaintiff was discharged from the hospital in June 4, 2004. *Id.* On July 12 and August 23, 2004, Plaintiff returned to Sioux Valley for an x-ray of the spinal fusion hardware. AR 340, 342. The positioning and alignment of the hardware was satisfactory and had not changed. *Id.*

Dr. Wellman referred Plaintiff to a physical therapy program at Sioux Valley Hospital. AR 355. Plaintiff reported to the program for the first time on September 9, 2004. AR 354. His lumbar range of motion was moderately limited. AR 355. His lower extremity strength was 4/5 bilaterally.

*Id.* The physical therapist prescribed a home exercise program and assessed his rehabilitation potential as "good." AR 355-56. Plaintiff participated in the physical therapy program for two weeks, until Dr. Wellman advised him to stop because of his increased pain complaints. AR 349.

Plaintiff saw Dr. Jack Gaspari, MD at Sioux Valley Hospital on October 13, 2004. AR 359. He complained of right lower back pain. He was at the time undergoing rehabilitation and taking medication to control his pain. *Id.* His physical exam was relatively normal except for right SI joint tenderness. Dr. Gaspari performed a right SI joint injection. *Id.*

On November 29, 2004, AP lateral flexion and extension x-rays of the lumbar spine showed the interbody fusion cages with normal alignment. AR 366. The remaining disk spaces were preserved and vertebral body height was maintained. *Id.* On December 22, 2004, Plaintiff had an MRI of the lumbar spine. AR 368. It showed evidence of the interbody fusion at the L4-5 and L5-S1 without complication. *Id.*

### 2. Dr. McKenzie, Orthopedic Associates (11/01-3/04)

Plaintiff presented at Orthopedic Associates on November 12, 2001. AR 307. He complained of low back pain radiating into his right leg. He was then working as a cab driver. *Id.* He indicated his pain had greatly increased in the past two weeks, to the point that he recently went to the emergency room. There he received a prescription for hydrocodone which he believed helped relieve his pain. *Id.* Dr. McKenzie obtained new x-rays which showed disc space narrowing in the lower lumbar spine. AR 303. Dr. McKenzie also reviewed the MRI from 1999. Dr. McKenzie decided to order a fresh MRI.

On November 28, 2001, Plaintiff returned. His range of motion was significantly limited. AR 303. The new MRI showed degenerative changes at L4-5 and L5-S1 and a small to moderate herniating at L4-5. Dr. McKenzie did not believe the herniating was causing all of Plaintiff's problems. *Id.* Dr. McKenzie believed it was the arthritic condition at the L4-5 that was causing Plaintiff's back pain. *Id.* He recommended an epidural block and a return visit in a few weeks.

Plaintiff returned after his epidural block AR 300. Plaintiff reported the block "completely relieved" his symptoms. *Id.* They began to return, however, within about six weeks. The epidural

allowed him to return to driving his cab and to cut back significantly on his medications. *Id.* Dr. McKenzie noted Plaintiff could return to work within his FCE and ordered another epidural block. *Id.* Plaintiff returned in February, 2002. AR 300. Dr. McKenzie ordered another epidural block. *Id.* When Plaintiff returned in June, 2002, he reported a sharp increase in his low back pain. AR 300. He requested hydrocodone which he had received in the emergency room but which he had used up. AR 297. Dr. McKenzie decided to order another MRI. *Id.* Dr. McKenzie indicated Plaintiff could continue to work within the FCE guidelines as tolerated. *Id.*

On June 26, 2002, Plaintiff visited Dr. McKenzie again. Dr. McKenzie interpreted the results of the newest MRI. AR 297. It showed persistent L4-5 disc herniating compressing the nerve root. Plaintiff requested another epidural block, but indicated if the pain became chronic or recurrent a microdiscectomy might become necessary. *Id.* Dr. McKenzie scheduled the epidural and allowed Plaintiff to return to work within the FCE. *Id.* Plaintiff requested another epidural five weeks later. AR 297. Dr. McKenzie again returned him to work within his FCE limitations. *Id.*

Plaintiff called Dr. McKenzie's office on Christmas Eve, 2002, indicating he'd had an acute episode of back pain and had been in the Sioux Valley Emergency room the night before. AR 295. He requested an accelerated appointment with Dr. McKenzie. He was advised to give time to the medications he received at the ER and call back if he had further problems. *Id.* Plaintiff appeared for his regularly scheduled appointment on January 8, 2003. AR 295. He had an epidural block after his Christmas Eve episode and was doing much better since then. *Id.* He had a normal physical exam. Dr. McKenzie instructed him to continue with a home exercise program and return in three months. *Id.*

Plaintiff called requesting a refill of his Darvocet in March, 2003. AR 292. The medication was refilled and Plaintiff returned to see Dr. McKenzie in April. *Id.* Dr. McKenzie noted the epidural blocks were giving Plaintiff about three months of relief. Plaintiff's straight leg exam was negative. Dr. McKenzie discussed the possibility of a fusion surgery but Plaintiff was not interested in that option. AR 292. Another epidural was performed on April 7. On April 25, Plaintiff reported the epidural worked nicely and he was feeling much better. AR 292. Plaintiff's physical exam was

completely normal.  Dr. McKenzie prescribed Celebrex[2] and prescribed Darvocet which was to be used "extremely sparingly."  *Id.*  Plaintiff underwent another epidural block on July 15, 2003.  AR 289.

Plaintiff saw Dr. McKenzie on September 17, 2003.  AR 289.  He was depressed and tearful about his ongoing back problems.  *Id.*  Dr. McKenzie suggested a repeat MRI and the possibility of seeking treatment for depression.  *Id.*  On September 24, 2003, the new MRI showed improvement of the L4-5 disc protrusion.  AR 289.  Dr. McKenzie suggested a pain management program and a smoking cessation program.  He also scheduled another epidural block.  *Id.*  Plaintiff called Dr. McKenzie's office in late November, 2003 asking for a Darvocet refill and indicating he had been missing work because of back pain.  AR 285. The refill was granted and a followup appointment made with Dr. McKenzie.  *Id.*  At Plaintiff's next visit in February, 2004, Dr. McKenzie recommended a discogram, which he referred to as "step one" in consideration of a fusion surgery of the L4-5 and L5-S1 levels of Plaintiff's spine.  AR 285.

On March 1, 2004, Dr. McKenzie performed a discography on the Plaintiff at Sioux Falls Surgical Center.   AR 279. It showed a concordant pain response at the L4-5 level.  *Id.*  There was a mild pain response at the L5-S1 level.  AR 284.  Because both levels were abnormal on the MRI, Dr. McKenzie thought both should be addressed in any fusion surgery.  *Id.*  Plaintiff decided to proceed with the fusion surgery.  *Id.*  Dr. McKenzie removed Plaintiff from work until further notice. *Id.*

### 3.    Dr. Bryan Wellman, Neurosurgical Associates (4/04-12/04)

Dr. Wellman saw Plaintiff on April 4, 2004 to advise him about fusion surgery.  AR 389. By then, Plaintiff had undergone over a dozen epidural injections.  *Id.*  The surgery was scheduled after Plaintiff's work comp carrier approved it.  AR 388.  Dr. Wellman performed the fusion surgery on June 1, 2004.  AR 328.  On July 12, 2004, Plaintiff returned to Dr. Wellman's office for a post-

---

[2]Celebrex is indicated for the relief of the signs and symptoms of osteoarthritis. www.rxlist.com.

operative check. AR 382. His back pain symptoms were reduced. Dr. Wellman believed Plaintiff was healing nicely. Dr. Wellman expected slow, continued improvement. AR 381. On August 23, 2004, Plaintiff was "significantly better" but continued to have right -sided pain. AR 379. Sitting and relaxing caused no pain, but increased activity caused increased pain. Dr. Wellman considered Plaintiff a "surgical success" and prescribed a six week physical therapy program. AR 378. When Plaintiff returned to Dr. Wellman in October, 2004, he was feeling "much better" and had been to see Dr. Blow. AR 376. Dr. Wellman released Plaintiff to a prn status. AR 375. Plaintiff returned in December, 2004. AR 374. He reported feeling worse than his pre-operative state with significant back and leg pain. *Id.* Dr. Wellman ordered a repeat MRI to make sure there was no unexpected problems. AR 373. The MRI was performed on December 22, 2004. AR 372. It showed no evidence of complicating features such as infection, recurrent disc herniating, or adjacent level disc herniating. AR 371.

### 4. McKennan Hospital (12/99- 4/05)

Plaintiff presented to the Emergency Room at McKennan Hospital on December 27, 1999. He was seen by Dr. Walter Carlson. AR 195. He described back pain that had been present for about a week. *Id.* He was at the time a truck driver. *Id.* He described the pain as sharp pain which began on the left side, but was now on the right side . His gait was normal but his range of motion was significantly decreased. He previously had an MRI at Sioux Valley Hospital but it was unavailable for Dr. Carlson's review. Dr. Carlson's impression was degenerative disc disease with mechanical low back pain. Dr. Carlson discussed Plaintiff's options with him and released him from work. AR 194. Dr. Carlson suggested a return appointment and indicated Plaintiff could schedule an epidural block in the meantime if he wished. AR 196. Plaintiff returned once to see Dr. Carlson on January 4, 2000. AR 307. He reported he was improving nicely under the care of his chiropractor (Dr. Gage). Dr. Carlson provided Plaintiff with a copy of his MRI, and told Plaintiff to show it to the chiropractor. Dr. Carlson recommended epidural injections if Plaintiff had any further problems. *Id.* In March, 2000, Dr. Gage consulted with Dr. Carlson about refilling Plaintiff's prescription for Tylenol #3. AR 307.

Plaintiff presented at the McKennan Hospital Emergency Room on October 23, 2001. AR 233. He complained of low back pain. He reported no recent injury; just that he'd run out of pain medication. *Id.* He had been to the chiropractor the day before. By this date he was employed as a cab driver. *Id.* He reported he had been drinking whiskey every day for the past two weeks but denied using "street" drugs. His physical exam revealed good strength in his lower extremities but pain when rising from a sitting or lying down position. AR 234. The ER physician prescribed a few Darvocet and Flexeril, and instructed Plaintiff to return to Dr. Alvine or a physician of Plaintiff's choice for further treatment of his chronic pain. *Id.*

Dr. Blow referred Plaintiff to a physical therapy program at McKennan Hospital beginning on April 11, 2005. AR 402. Plaintiff's primary complaint was low back and gluteal region pain. *Id.* On that date he rated his pain a 3/10 although he indicated that with increased activity his pain rated a 10/10. He reported that although he drove a cab for a while after his 1999 injury, he was not currently working. AR 402. His goal for therapy was to decrease his pain and get back to work. *Id.* The therapist indicated a desire to work with Plaintiff three times per week on an aquatic exercise program. AR 400. It appears, however that Plaintiff participated once and "did not tolerate the therapy." AR 399. He was discharged from the program per Dr. Blow's recommendation. *Id.* AR 398.

**5.      Fisher Chronic Pain and Rehabilitation Center (8/00-9/00)**

Plaintiff began physical therapy at Fisher Chronic Pain and Rehab center on August 17, 2000. AR 226. He reported pain in his low back and right leg. *Id.* The therapist requested Plaintiff to come in twice a day, but he declined. *Id.* Plaintiff continued with physical therapy on an almost daily basis until his case manager directed he be discharged. AR 197.

**6.      Dr. Greg Alvine (6/00-1/01)**

Plaintiff saw Dr. Greg Alvine on June 23, 2000. AR 231. He complained of low back pain which began when he was unloading freight from his truck. He described pain across his low back which did not radiate into his legs. He tried to return to work three or four months after the injury but only worked for two days. When he started lifting again, the pain flared. Until he saw Dr.

Alvine, his care had primarily been chiropractic. His physical exam was relatively normal. AR 231. Dr. Alvine interpreted an x-ray of Plaintiff's lumbar spine. AR 232. It showed no evidence of instability. He also reviewed the December, 1999 MRI of Plaintiff's lumbar spine. Dr. Alvine interpreted the MRI to show degenerative changes at L4-5 and L5-S1 and mild central disc protrusion at L4-5 and L5-S1. *Id.* Dr. Alvine suspected the L4-5 and L5-S1 motion segment was the pain generator. AR 230. He recommended conservative measures including the McKenzie back exercise program/physical therapy. Dr. Alvine also advised Plaintiff would at least temporarily have to find another line of work. *Id.* He recommended a two level fusion surgery as a "last resort." AR 230. Dr. Alvine noted, however, that he would require Plaintiff to stop smoking for six months before he would consider a surgical procedure on Plaintiff's spine. *Id.* Dr. Alvine restricted Plaintiff to light duty work and prescribed a course of physical therapy. *Id.*

Plaintiff returned to Dr. Alvine in July, 2000. AR 229. He reported a flare of his back pain and that he was taking Tylenol #3 to control the pain. Dr. Alvine advised that if surgery was to be considered a discography would be the next diagnostic step. Dr. Alvine remained concerned, however, about Plaintiff's smoking habit. Dr. Alvine also opined that with or without a fusion surgery, Plaintiff probably would not be capable of returning to heavy manual labor. AR 229. Dr. Alvine did not impose a driving restriction but indicated Plaintiff would not be able to unload his truck alone. *Id.*

Plaintiff saw Dr. Alvine next in October, 2000. AR 228. Plaintiff had participated in a "Vax-D" therapy program which he did not believe was helpful. He reported continuing low back pain, especially with bending, twisting and lifting. *Id.* Dr. Alvine's exam revealed good strength, normal sensation, and symmetrical reflexes. Straight leg rasing tests were negative. Plaintiff was reluctant to consider a fusion; Dr. Alvine agreed. Dr. Alvine opined Plaintiff had reached maximum medical improvement, and referred him for a functional capacity examination. AR 228.

Plaintiff saw Dr. Alvine for the final time on January 11, 2001. AR 227. Dr. Alvine reviewed Plaintiff's functional capacity evaluation with him. Dr. Alvine explained Plaintiff should not lift over thirty pounds or push/pull over 100 pounds. He could sit for eight hours but needed

to be able to get up and move around every forty-five minutes.  He needed to avoid repetitive bending and twisting.  AR 227.  Dr. Alvine prescribed Darvocet to be used "sparingly" and Flexeril to be used for muscle spasms.[3]

### 7.      Dr. David Strand (6/04-1/05)

Plaintiff saw Dr. Strand on June 8, 2004 for follow up after his fusion surgery.  AR 397.  Plaintiff reported he was doing well and his incision was healing nicely.  Dr. Strand instructed Plaintiff not to lift over ten pounds for the next five weeks.  *Id.*  Plaintiff reported no problems during his follow-up appointment with Dr. Strand in July.  AR 396.  Plaintiff followed with Dr. Strand regarding issues pertaining to healing of the incision site.  AR 391-95.

### 8.      Sioux Falls Physical Medicine (Dr. Jerry Blow) (10/04-3/06)

Dr. Wellman referred Plaintiff to Dr. Jerry Blow (physiatrist) in October, 2004, after Plaintiff's fusion surgery for a rehabilitation program.  AR 441.  Plaintiff described his pain level as a 4 at rest and a 10 with activity.  AR 440.  He reported he had not worked at all since his fusion surgery.  AR 439.  Dr. Blow's examination revealed normal strength in Plaintiff's upper and lower extremities, but pain over the right SI joint.  AR 438.  His range of motion was also limited on the right.  AR 438.  Dr. Blow prescribed a right SI joint injection, and a program of physical therapy at Dakota Rehabilitation.  AR 437.  Dr. Blow also prescribed Bextra, Skelaxin and Effexor.[4]

In a note dated October 27, 2004, Dr. Blow opined that perhaps Plaintiff's ongoing pain problems are caused by an injury to his SI joint.  AR 436.  In November, 2004, Dr. Blow authorized

---

[3]Darvocet is indicated for the management of mild to moderate pain.   Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions.     www.rxlist.com.

[4]Bextra is indicated for the relief of signs and symptoms of osteoarthritis and adult rheumatoid arthritis.  Skelaxin is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions.  Effexor is indicated for the treatment of major depressive disorder.  www.rxlist.com.

an NMES[5] unit to control Plaintiff's pain symptoms. AR 435. Plaintiff reported the NMES unit was "very helpful" and improved his back pain. AR 434. As of November 8, 2004, however, Dr. Blow had not yet returned Plaintiff to work. AR 433. At the end of November, 2004, Plaintiff reported his back pain was worse again. AR 430. Dr. Blow ordered repeat films of his lumbosacral spine to check the status of his fusion. *Id.* Dr. Blow also suspended Plaintiff's physical therapy and referred Plaintiff back to Dr. Wellman for further evaluation. *Id.* The films Dr. Blow ordered at the end of November revealed the fusion was normally aligned and the remaining discs were preserved. AR 428. When Plaintiff returned to see Dr. Blow in January, 2005, he reported continuing low back pain. AR 427. Dr. Blow consulted with Dr. Wellman and was assured the fusion and surrounding discs were stable. AR 426. Dr. Blow planned further physical therapy and muscle energy mobilization. AR 425. By February, 2005, Plaintiff reported feeling much better and that he had nearly quit smoking. AR 423. Dr. Blow prescribed Tizanidine[6] to control muscle tension. On February 16, 2005, Dr. Blow indicated he was not sure when Plaintiff would be able to return to work. AR 421. In April, 2005, Dr. Blow transitioned Plaintiff to pool therapy. AR 414. The pool therapy was discontinued in May, 2005. AR 412.

In May, 2005 Dr. Blow opined ongoing therapy would not make a big difference for Plaintiff and he could switch to an independent exercise program. AR 411. Dr. Blow also recommended Plaintiff obtain a part-time local trucking job that did not require loading and unloading, and work his way up to over the road trucking in four to six months. Dr. Blow imposed a twenty-five pound lifting restriction. Dr. Blow imposed the following permanent restrictions: He indicated that in one month (June 2005) Plaintiff could be released to light to medium level work with a thirty pound maximum carrying/lifting restriction; stand/walk six hours per day and sit/drive five to eight hours per day. AR 411. Bending, squatting, climbing and twisting were limited to occasionally and Plaintiff could reach constantly and kneel frequently. *Id.* Plaintiff should be allowed to change

---

[5]NMES is an acronym for neuromuscular electrical stimulation.

[6]Tizanidine is the generic name for Zanaflex. It is a short-acting drug for the management of spasticity. www.rxlist.com

positions frequently. On May 31, 2005, Dr. Blow assigned a 20% of the whole person impairment of the lumbosacral spine. AR 406. Dr. Blow's final note indicates Plaintiff may need physical therapy sessions three or four times a year for pain flare-ups. AR 404.

### 9. Dakota Rehabilitation Center (10/04-4/06)

Plaintiff reported to Dakota Rehabilitation Center for an initial evaluation in October, 2004 at the request of Dr. Blow. AR 489. His physical therapy continued several times per week throughout the remainder of 2004 and until May, 2005. AR 449. Plaintiff's therapy program consisted of treadmill walking, low level laser therapy, manual therapy, and an NMES unit for mobile/home use. AR 450,452. Plaintiff returned for four physical therapy sessions in April, 2006 when he had a flare of his pain symptoms. AR 442. In 2006 Plaintiff reported feeling "much better than he has felt in a long time" at the conclusion of his first session. *Id.* The therapist did not believe any further therapy was needed and discharged Plaintiff from care after four sessions. *Id.*

### 10. Sioux Valley Physician Group (Dr. Amundson, Dr. Hruby) (10/00-1/08)

Plaintiff treated with Dr. Amundson and then Dr. Hruby at the Sioux Valley Clinic for ongoing routine care of his acne condition. AR 501-09. He also obtained refills of various other medications such as Celebrex, Naprosyn and Hydrocodone. AR 501,507.

### 11. Non-examining, non-treating physician FCA (Dr. Frederick Entwistle) (7/06)

Dr. Entwistle reviewed Plaintiff's medical records and completed a Functional Capacity Assessment on July 18, 2006. AR 176-83. Dr. Entwistle did not treat or examine Plaintiff. *Id.* Dr. Entwistle indicated Plaintiff's primary diagnosis was status post L4-5 and L5-S1 fusion (6-1-04). His secondary diagnosis was obesity. AR 176. Dr. Entwistle opined Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand/walk six hours out of an eight hour day with normal breaks, sit six hours out of an eight hour day with normal breaks, and perform unlimited push/pull activities. AR 177. Dr. Entwistle limited Plaintiff to occasional climbing of ladders, stooping, kneeling, crawling and crouching. He said Plaintiff could climb and balance frequently. He assigned no manipulative, visual, communicative, or environmental limitations. AR 179-80.

Dr. Entwistle specifically mentioned Dr. Blow's rehabilitation program and recommendations in his "additional note" section.  AR 178.   Dr. Entwistle did not view the restrictions he imposed as significantly different from Dr. Blow's restrictions.  AR 182.

### D.    Third Party Reports

Plaintiff's mother (Linda Johnson) completed a "Function Report–Third Party" on June 2, 2006.  AR 137-144.  She indicated she spends about two or three hours per week with Plaintiff, playing cards or going out to eat.  AR 137.  She does not know what he does during the day.  *Id.* She does not perceive his condition causes him to have any problems with personal care issues.  AR 148.  He prepares his own meals.  AR 139.  He does his own cleaning, laundry and yard work, although he tells her it takes him longer than normal to complete these tasks.  *Id.*  He is capable of driving alone.  AR 140.  He shops for his own clothes and groceries even though he "hates" to do it.  AR 140.[7]   His hobbies are watching T.V., fishing, hunting and playing cards.  AR 141.  She explained that Plaintiff's lifting is limited and that squatting, bending, standing, reaching and kneeling all seem to cause "strain and pain."  AR 142.  Completing tasks takes longer than normal. *Id.*  She does not perceive Plaintiff has any trouble following written or verbal commands.  *Id.*  His ability to get along with others is affected by how uncomfortable he is.  AR 144.

An unsigned Third Party Report from Plaintiff's last employer (Yellow Cab Company) appears in the record.  AR 171-73.  The Vice President of the Company (Tallie Kinsley), is the contact person named on the report.  She, however, did not sign the form; the form is completely devoid of substance  except for  a handwritten indication  Plaintiff was employed as a cab driver from July, 2001 through February, 2004.  AR 171.

### E.    Hearing Testimony

Plaintiff's administrative hearing was held on February 14, 2008.  Plaintiff testified and was represented by counsel at the hearing.  A vocational expert (VE), William Tucker, also testified.

---

[7]Mrs. Johnson does not claim Plaintiff's hatred for shopping is related  to his alleged disability.

Mr. Johnson was forty-seven years old at the time of the hearing and lived alone in a mobile home with his dog. AR 23. His last employment as a cab driver with Yellow Cab ended in February, 2004. *Id.* He received a worker's compensation insurance settlement for a back injury and had been using that for income. AR 25. The injury occurred in 1999, but the surgery (performed by Dr. Wellman) did not occur until June 1, 2004. AR 26-27. He had a spinal fusion of the L4-5 and L5-S1. AR 27. After surgery Plaintiff saw Dr. Blow, who referred him to Dakota Rehab for therapy. AR 27. He learned exercises and received prescription medication. *Id.* Currently he is under the care of only his family physician, Dr. Hruby, who renews his medications (Naproxen and Hydrocodone). AR 27-28.

Before the surgery, Plaintiff had muscle spasms and stabbing pain in his lower back. AR 28. The only time he felt well in the past eight years was when he had epidural blocks. *Id.* Post-surgery, he feels a burning sensation in his right leg after he stands for a while. *Id.* He also continues to experience low back pain. *Id.*

Plaintiff attended high school in Yankton but he did not finish. AR 29. He dropped out in ninth grade. He obtained his GED in 2001. AR 44. He attempted testing at Southeast Vo-Tech for some classes there, but did not complete it because he was unfamiliar with the computer system. AR 29. He does not own a computer and does not know how to operate windows or send/receive email. AR 29-30.

His past work experience includes driving a cab, delivery truck driver, concrete truck driver, and tractor/trailer truck driver. AR 30. He does not have a current DOT health card, but he does have a current commercial driver's license (CDL). AR 36. After his injury, Dr. Blow assigned work restrictions. AR 31. Dr. Blow told him he could lift up to 30 pounds. *Id.* He can twist and bend occasionally. He does not recall that he received a written page with his limitations, but his back tells him what he can and can't do. AR 32. The restrictions assigned by Dr. Blow are the most recent work restrictions he recalls receiving. AR 38. When the ALJ read Dr. Blow's restrictions into the record, Plaintiff indicated he does not believe he could perform a job within those restrictions because he is "absolutely miserable doing basically nothing." AR 38.

He usually falls asleep at about 3:00 or 4:00 a.m. and wakes up around 9:00 or 10:00. AR 32. He feels pretty good when he wakes up. He feels a little stiff and sore, but he does exercises and takes a hot shower to try to get loosened up. *Id.* He is up for a couple of hours before he takes a break because of the pressure on his low back; then he needs to lay down. *Id.* He uses his TENS unit and his muscle stimulator to relax his muscles. *Id.* Those were prescribed by Dr. Gage and Dr. Blow. AR 33. He does not believe he can sit for six hours out of an eight hour day with normal breaks. *Id.* He thinks the longest he can sit without a break is two hours. When he experiences pain he needs to lie down or sit in a recliner to relieve the pain/pressure in his back. AR 33. He estimates he spends about seven or eight hours per day (not including night sleep) lying down for purposes of pain relief. AR 40. He estimates he can stand for about 15-20 minutes before needing to sit down, and walk for about six blocks. AR 34. He indicated that, post-surgery, his pain is "pretty mild" (2/3 out of 10) but by the end of the day it is "just unbelievable." AR 34-35. Plaintiff indicated he "can't say anything good" about his surgery, and would have preferred to just continue having epidural blocks. AR 41.

Plaintiff's current medications are Hydrocodone and Naproxen. AR 34. He takes two Naproxen a day, and Hydrocodone on an as-needed basis. His physician will only allow him to have ten Hydrocodone per month. AR 34. Because he is only allowed ten Hydrocodone per month, he only takes them when his pain is "absolutely unbelievable." AR 40. He also takes acetaminophen and Tylenol PM to help him sleep. *Id.*

William Tucker testified as a vocational expert (VE) in Plaintiff's case. AR 43. He testified Plaintiff does not have any transferrable skills. AR 44. Plaintiffs job history involves physical work requiring medium or above exertion. *Id.*

The ALJ posed three hypothetical questions to the VE. The first hypothetical asked the VE to assume an individual with Plaintiff's age, education, and work experience, and medical impairments as described by Plaintiff during the hearing. AR 45. The VE opined such an individual would be precluded from Plaintiff's past relevant work and any other work the VE could identify.

*Id.* Plaintiff's expressed need to lie down most of the day would rule out any gainful employment. AR 45.

The ALJ's second hypothetical asked the VE to assume an individual with Plaintiff's age, education, and work experience, along with the physical restrictions imposed by Dr. Entwistle's FCE (occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk/sit six hours out of an eight hour day with normal breaks, unlimited push/pull, postural activities are all limited to occasional, frequent climbing of ramps or stairs and frequent balancing; no manipulative, visual, communicative or environmental limitations). The VE opined such a person would be unable to perform any of Plaintiff's past relevant work, but would be able to perform a full range of light and sedentary work. AR 46. Jobs included in those categories are: assembler, production worker, and laundry folder. *Id.*

The ALJ's third hypothetical asked the VE to assume an individual with Plaintiff's age, education and work experience, along with the physical restrictions imposed by Dr. Blow. AR 46. The VE opined such a person would be unable to perform any of Plaintiff's past relevant work. *Id.* The VE also opined there would be a limited number of light duty jobs that would be compatible with such restrictions (specifically the ability to change positions at will and with the sit/stand option) , such as inspector, hand packager, and marker/labeler. ( AR 47). If Plaintiff's testimony as to his physical abilities is credited as fully accurate, however, he would be incapable of any of the jobs identified by the VE, because of his need for unscheduled breaks. AR 47-48.

## DISCUSSION

### A.      Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420,

28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Id. If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

**B.      The Disability Determination and The Five Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled

can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

**Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan,* 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

### C.      Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

### D.      The ALJ's Decision

The ALJ issued a nine page, single-spaced decision on April 5, 2008. The ALJ's decision discussed steps one through five of the above five-step procedure. At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity from  his amended alleged onset date (December 31, 2002) through his date last insured (September 30, 2007).  AR 9.

At Step Two, the ALJ determined Plaintiff has the following severe impairments: obesity and lumbar degenerative disc disease status post fusion at L4-5 and L5-S1.  AR 9.

At Step Three, the ALJ determined Plaintiff does not have an impairment of combination of impairments that meet or equal a  "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d), 404.1525 and 404.1526.  AR 9.

At Step Four, the ALJ found Plaintiff is unable to return to his past relevant work, but  has the residual functional capacity to perform a full range of light duty work as defined in C.F.R. 404.1567(b)  AR 10.  This finding was based on "the State agency physician's assessment . . . this assessment is given great weight because it is supported by the evidence of record."  AR 10.

At Step Five, the ALJ determined Plaintiff is capable of a full range of light duty work.  He determined he remained capable of such occupations as: production assembler and laundry folder. AR 15.   As such the ALJ determined Plaintiff is not "disabled" as that term is defined by the Social Security Act.  *Id.*

### E.    The Parties' Positions

Plaintiff asserts the ALJ erred by finding him not disabled within the meaning of the Social Security Act. He asserts the ALJ erred in three ways: (1) by failing to give controlling weight or identify what weight to give the opinions of the treating physicians; (2) by failing to properly evaluate Plaintiff's subjective complaints regarding his symptoms; and (3) by failing to develop the record sufficiently to determine the full extent of Plaintiff's impairments, both severe and not severe. The Commissioner asserts substantial evidence supports the ALJ's determination that Plaintiff is not disabled, and the decision should be affirmed.

### F.    Analysis

Plaintiff asserts the ALJ made three mistakes: (1) by failing to give controlling weight or identify what weight to give the opinions of the treating physicians; (2) by failing to properly evaluate Plaintiff's subjective complaints regarding his symptoms; and (3) by failing to develop the record sufficiently to determine the full extent of Plaintiff's impairments, both severe and not severe. These assertions are discussed in turn:

### 1.    Whether the ALJ failed to properly consider the opinions of Plaintiff's treating physicians

The ALJ adopted the RFC which was determined by Dr. Entwistle, the non-treating, non-examining State Agency physician. AR 176-83. On July 18, 2006, Dr. Entwistle opined Plaintiff is capable of light duty work. *Id. See* 20 C.F.R. § 404.1567(b). Dr. Entwistle noted there was a treating source statement regarding Plaintiff's capabilities in the file and he specifically mentions Dr. Blow's treatment notes containing a 30 pound restriction. Dr. Entwistle also believed his light duty restrictions were not significantly different from the treating source's restrictions. AR 182. On May 2, 2005, Dr. Blow imposed the following permanent restrictions: "light to medium duty level work with 30 pound max lift with frequent carrying or lifting objects weighing up to 20 pounds. He could stand and walk six to eight hours a day and sit and drive five to eight hours a day. He could bend, squat, climb and twist occasionally. He can reach constantly. Kneel frequently. He should be able to change positions frequently. At that point, I think that those most likely would be a permanent restriction." AR 411. These restrictions also meet the definition of light duty work. *See* 20 C.F.R. § 404.1567(b).

While the opinion of a non-examining consulting physician *standing alone* does not constitute substantial evidence, when the ALJ relies on the opinion as one part of the record which as a whole supports his findings, it is sufficient. *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004). *See also, Anderson v. Barnhart*, 344 F.3d 809, 812-13 (8th Cir. 2003) (generally consulting physician opinion does not constitute substantial evidence but there are two exceptions: (1) where the consulting assessment is supported by better or more thorough medical evidence; (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions). Dr. Entwistle explained that his opinion was consistent with Plaintiff's treating physiatrist (Dr. Blow). No physician in this case, including any of Plaintiff's treating physicians, has indicated he is incapable of working. Both the State Agency Physician (Dr. Entwistle) and his treating physician (Dr. Blow) agree he is capable of light duty work. The ALJ's decision, therefore, is supported by substantial evidence.

Also, 20 C.F.R. § 404.1527(d) provides the factors to consider for assigning weight to medical opinions. That regulation provides:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of treatment relationship and frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s)the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****. When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

In this instance, although Dr. Entwistle was not a treating or examining physician, his opinion is consistent with the long-time treating physician (Dr. Blow) and is supported by the record as a whole.

## 2. Whether the ALJ Failed to Properly Consider Plaintiff's Subjective Pain Complaints

Plaintiff asserts the ALJ failed to properly consider the *Polaski*[8] factors when evaluating Plaintiff's credibility regarding pain complaints/symptoms. The ALJ discussed Plaintiff's pain complaints/symptoms beginning on page 4 of his written decision. This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). "When an ALJ reviews a claimant's subjective allegations of pain and determines whether the claimant and his testimony are credible, the ALJ must examine the factors listed in *Polaski* and apply those factors to the individual." *Reynolds v. Chater*, 82 F.3d 254, 258 (8th Cir. 1996). *See also Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3). In this case, the ALJ's lengthy analysis applies some of the *Polaski* factors and explains how they apply to Plaintiff. The ALJ is not required to "explicitly discuss *each Polaski* factor in a methodical fashion" but rather it is sufficient if he "acknowledge[s] and consider[s] those factors before discounting [the claimant's] subjective complaints of pain." *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996) (emphasis added).

The appropriate factors to be considered when evaluating whether a claimant's subjective complaints are consistent with the evidence as a whole are: (1) the objective medical evidence; (2) the claimant's daily activities; (3) the duration, frequency and intensity of pain; (4) dosage and effectiveness of medication; (4) precipitating and aggravating factors; (5) functional restrictions; (6) the claimant's prior work history; (7) observations by third parties; (8) diagnosis by treating and examining physicians; (9) claimant's complaints to treating physicians. *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001); *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

The ALJ did not explicitly cite *Polaski* but did cite 20 C.F.R. § 404.1529, and he did discuss several of the relevant factors in determining the credibility of Plaintiff's pain complaints. For example, he discussed his lack of medical treatment after 2006. (AR 13). The ALJ found this lack of treatment reflected negatively on Plaintiff's credibility and was inconsistent with his claims of

_____

[8]*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

disabling pain. AR 13. This finding is supported by substantial evidence in light of Dr. Blow's indication that three to four therapy sessions per year would likely be necessary for pain flare-ups. AR 404.

The ALJ compared Plaintiff's claimed pain with his admitted daily activities, which at the time of hearing included hunting, fishing, driving, shopping, and living independently (including doing his own cooking, cleaning, and lawn care). Nevertheless, Plaintiff asserted he could not work full time. The ALJ also noted the medical opinions in the record, including the RFC opinions from Dr. Entwistle (the non-examining consulting physician) and Dr. Blow (the treating physician), which both indicated Plaintiff is capable of at least light duty work. The ALJ's credibility findings are supported by good reasons and substantial evidence. They will not, therefore, be disturbed. *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999).

### 3. Whether the ALJ Failed to Adequately Develop the Record to Determine the Full Extent of Plaintiff's Impairments, Both Severe and Non-Severe

Finally, Plaintiff asserts the ALJ failed in his duty to develop the record "by not addressing the current status of [Plaintiff's] back condition, and by not obtaining additional medical input into [Plaintiff's] current condition." Plaintiff asserts the ALJ erred by failing to obtain a functional capacity evaluation instead of relying upon the FCE provided by the State Agency physician (Entwistle).

The ALJ is not required to go to inordinate lengths to develop Plaintiff's case, but is required to make an investigation that is not "wholly inadequate" under the circumstances. *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994). The ALJ is required to develop the record fairly and fully because Social Security hearings are designed to be a non-adversarial quest to award benefits to deserving applicants. *Id.* at 44. The ALJ is required to order further medical examinations or tests "only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994). The appropriate inquiry is whether Plaintiff was prejudiced or treated unfairly by how the ALJ developed the record; absent unfairness or prejudice, remand is inappropriate. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). Because the FCE formulation provided by the State Agency physician (Entwistle) and

relied upon by the ALJ is virtually identical to the restrictions provided by Plaintiff's treating physician (Blow), the evidence relied upon by the ALJ is sufficient. No unfairness or prejudice, therefore, has been shown. The ALJ had no duty to more fully develop the record and remand on this ground is inappropriate. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).

## CONCLUSION

For the reasons explained above, it is respectfully recommended that the Commissioner's denial of benefits be AFFIRMED, and the Plaintiff's Complaint be DISMISSED, with prejudice and on the merits.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

*Nash v. Black,* 781 F.2d 665 (8th Cir. 1986).

Dated this 29th day of June, 2010.

BY THE COURT:

s/John E. Simko

_____
John E. Simko
United States Magistrate Judge